**THE WAGNER FIRM**
Avi Wagner (#226688)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 491-7949
Facsimile:  (310) 491-7949
Email:  avi@thewagnerfirm.com

*Attorney for Plaintiff*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC HABER, derivatively on behalf of CAPSTONE TURBINE CORP. <br><br> Plaintiff, <br><br> v. <br><br> DARREN R. JAMISON, EDWARD I. REICH, JAYME BROOKS, RICHARD ATKINSON, NOAM LOTAN, GARY MAYO, GARY SIMON, ELIOT PROTSCH, HOLLY VAN DEURSEN, and DARRELL WILK, <br><br> Defendants, <br><br> -and- <br><br> CAPSTONE TURBINE CORP. <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Isaac Haber ("Plaintiff"), by and through his attorneys, submits this Verified Stockholder Derivative Complaint against the Individual Defendants (as defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Capstone Turbine Corp. ("Capstone" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Capstone; and (c) review of other publicly available information concerning Capstone.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendant Capstone against certain officers and members of the Company's Board of Directors (the "Board").

2.     Capstone develops, manufactures, markets and services microturbine technology solutions for use in stationary distributed power generation applications, including cogeneration, integrated combined heat and power, and combined cooling, heat and power ("CCHP"), renewable energy, natural resources and critical power supply. In addition, microturbines can be used as battery charging generators for hybrid electric vehicle applications. According to the Company, microturbines allow customers to produce power on-site in parallel with the electric grid or stand alone when no utility grid is available. For customers who do not have access to the electric utility grid, microturbines provide on-site power, and for customers with access to the electric grid, microturbines provide an additional source of continuous duty power.

3.    On October 1, 2015, Capstone issued a press release disclosing that its preliminary second quarter earnings were "notably below management's expectations and analysts' consensus estimates as continued headwinds in the oil and gas market and a strong U.S. dollar delayed orders and shipments in the quarter."   The Company additionally disclosed that it "received no significant payments from its Russian distributor, who until recently was one of [its] largest customers."

4.    On November 5, 2015, after the market closed, Capstone disclosed its second quarter 2015 results.  The Company disclosed a net loss of $7.9 million or $0.02 per share for the quarter.

5.    From November 7, 2013 to November 5, 2015 (the "Relevant Period"), the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants knew or recklessly disregarded, but failed to disclose that, among other things:  (1) BPC Engineering ("BPC"), one of the Company's main Russian distributors, was unlikely to be able to fulfill many of its legal and financial obligations to Capstone; (2) Capstone failed to make appropriate adjustments to its accounts receivable and backlog to account for BPC's inability to fulfill its obligations to Capstone; (3) Capstone issued financial statements in violation of Generally Accepted Accounting Principles ("GAAP"); (4) the Company lacked adequate internal controls over accounting; and (5) as a result of the foregoing, the Company's financial statements, as well as the Individual Defendants' statements about Capstone's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6.    The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the wrongdoing alleged herein.

7.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Capstone has sustained damages as described below.

## JURISDICTION AND VENUE

8.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides or maintains executives offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES

11.     Plaintiff is a stockholder of Capstone, was a stockholder of Capstone at the time of the wrongdoing alleged herein, and has been a stockholder of Capstone continuously since that time.  Plaintiff purchased his first shares of Capstone common stock on August 13, 2008.  Plaintiff is a resident of New York.

12.     Defendant Capstone is a Delaware corporation with its principal executive offices located at 21211 Nordhoff Street, Chatsworth, California.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

3

13.     Defendant Darren R. Jamison ("Jamison") joined Capstone in December 2006 as President and Chief Executive Officer ("CEO") and has been a director since December 2006.  Upon information and belief, Jamison is a citizen of California.

14.     Defendant Edward I. Reich ("Reich") joined the Company in August 2005 as the Vice President of Financial Planning and Analysis and served as the Company's Executive Vice president and Chief Financial Officer ("CFO") from early 2008 until April 10, 2015.  Upon information and belief, Reich is a citizen of California.

15.     Defendant Jayme Brooks ("Brooks") was appointed CFO of Capstone in 2015 in addition to her role as Chief Accounting Officer.   She joined the Company in September 2005 and has served in various roles including:   Vice President of Finance and Chief Accounting Officer (November 2008 to April 2015), Vice President of Financial Planning and Analysis (February 2008 to November 2008), and Director of Financial Reporting (September 2005 to February 2008).  Upon information and belief, Brooks is a citizen of California.

16.     Defendant Richard Atkinson ("Atkinson") has served as a director of the Company since December 2005.  Upon information and belief, Atkinson is a citizen of Nevada.

17.     Defendant Noam Lotan ("Lotan") has been a director of the Company since June 2005.  Upon information and belief, Lotan is a citizen of California.

18.     Defendant Gary Mayo ("Mayo") has been a director of the Company since October 2007.  Upon information and belief, Mayo is a citizen of Michigan.

19.     Defendant Gary Simon ("Simon") has been a director of the Company since August 2005 and has served as Chairman of the Board since August 2010.  Upon information and belief, Simon is a citizen of California.

20.   Defendant Eliot Protsch ("Protsch") has been a director of the Company since April 2002 and served as Chairman of the Board from October 2002 through August 2010.  Upon information and belief, Protsch is a citizen of Florida.

21.   Defendant Holly Van Deursen ("Van Deursen") has been a director of the Company since October 2007.  Upon information and belief, Van Deursen is a citizen of Illinois.

22.   Defendant Darrell Wilk ("Wilk") has been a director of the Company since June 2006.  Upon information and belief, Wilk is a citizen of Minnesota.

23.   The defendants referenced above in ¶¶ 13-22 are referred to herein as the "Individual Defendants."

24.   The defendants referenced above in ¶¶ 13 and 16-22 are sometimes referred to herein as the "Director Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.   By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

27.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Capstone were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

28.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

29.     On July 20, 2004, the Board adopted a set of corporate governance guidelines which address the Board's governance role and functions to promote the functioning of the Board and its committees and to set forth a common set of expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

30.     The Corporate Governance Guidelines include the following language:

Role of the Board of Directors

The Board is elected by the Company's stockholders to, among other things, select, advise, counsel and monitor the performance of the leadership team, oversee the Chief Executive Officer (the "CEO"), assist in defining the policies, direction and goals of the Company and provide an effective corporate governance framework for the Company. The Board is the ultimate decision making body of the Company, except with respect to those matters reserved to or shared with the stockholders.

*     *     *

Conduct and Conflicts of Interest

The Board expects its members, as well as the Company's officers and employees, to be committed to the highest standards of honest, ethical and legal behavior.   The Company's Code of Business Conduct

provides guidance to all Directors, officers and employees in this regard. Each Director, officer and employee must certify, in writing, that he or she has read, understands and will adhere to the Code of Business Conduct. The Code of Business Conduct provides that it is the responsibility of every Director, officer and employee to ensure that his or her interests remain free of conflicts in the performance of his or her duties and that he or she engages in ethical and honest conduct. Pursuant to the Code of Business Conduct, any potential or known conflict of interest must be reported as soon as recognized. Employees must promptly report violations of the Code of Business Conduct to the Corporate Ethics Manager and members of the Board and officers may contact the Audit Committee directly. A waiver of the Code of Business Conduct may be made only by the Board to the extent necessary and warranted and shall be promptly disclosed to the extent required by law or regulation of any applicable securities exchange or market.

31.    The Company has also established a Code of Business Conduct (the "Code"), which "provides guidance to all Capstone directors and employees and assists us in carrying out our daily activities within appropriate ethical and legal standards" and "summarizes our expectations of accountability and the responsibility of all Capstone directors and employees." The Code states:

Financial Reporting

As a public company, Capstone's filings with the Securities and Exchange Commission must be accurate and timely. Each Capstone employee is responsible for the integrity and accuracy of our documents and records, not only to comply with regulatory and legal requirements but also to ensure that records are available to defend our business practices and actions. No one may alter or falsify information on any record or document. Depending on their position with Capstone, employees may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. Every employee, therefore, plays a role in accurate and ethical financial reporting, and is accountable for that responsibility.

32.    Furthermore, Capstone has a Code of Ethics for Senior Financial Officers and the CEO (the "Code of Ethics"). The Code of Ethics applies to

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

8

principal executive officers, principal financial officers, principal accounting officers and controllers, or persons performing similar functions (collectively, the "Senior Financial Officers").  The Code of Ethics is intended to deter wrongdoing and to promote:  (a) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (b) full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company; (c) compliance with applicable laws, rules and regulations; (d) the prompt internal reporting of violations of the Code of Ethics; and (e) accountability for adherence to the Code of Ethics.

33.    The Code of Ethics further states:

Compliance With Laws.

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.  All Senior Financial Officers must respect and obey the laws, rules and regulations of the jurisdictions in which we operate.  It is important for Senior Financial Officers to ensure compliance with these laws, rules and regulations and to take action promptly on any reports of violations or suspected violations.

\*       \*       \*

Public Company Reporting.

As a public company, the Company must provide full, fair, accurate, timely and understandable disclosure in reports and documents that it files with, or submits to, the Securities and Exchange Commission and in other public communications.  The Senior Financial Officers are directly involved in that process and have several responsibilities, including the following:

• Assuring that our public reports are complete, fair and understandable.  We expect you to take this responsibility very seriously.

•    Maintaining our books, records, accounts and financial statements in reasonable detail while ensuring that they appropriately reflect our transactions and conform both to applicable legal requirements and are subject to the Company's system of internal controls.  Unrecorded or "off the books" funds or assets should not be maintained.

•    Retaining or destroying records according to applicable law and any record retention policy we may establish from time to time.  In accordance with any such policy, in the event of litigation or governmental investigation, please consult the Company's counsel immediately.

•    Assuring that our public reports fairly and accurately reflect the business and finances of the Company.  If you believe that they do not, you have a responsibility to bring your concerns to the attention of the Chair of the Company's Audit Committee.

•    Complying with the Company's disclosure controls and procedures.

34.    Finally, the Audit Committee Charter (the "Charter") states that the primary purpose of the Audit Committee of the Board (defendants Atkinson, Lotan, Simon and Protsch) is to "oversee the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls.  The Audit Committee assists the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company."

35.    To that end, the Audit Committee, as laid out in the Charter, has the following responsibilities, among others:

•    Reviewing the audited financial statements and the quarterly financial results and discussing them with management and the independent auditors.  These discussions shall include any significant changes to the Company's accounting principles, the matters required to be discussed under Statement on Auditing Standards No. 61, as

amended, and the consideration of the quality of the Company's accounting principles as applied in its financial reporting, including a review of particularly sensitive accounting estimates, reserves and accruals, judgmental areas, audit adjustments (whether or not recorded) and other such inquiries as the Committee or the independent auditors shall deem appropriate.  Based on such review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K.  The Committee shall review and resolve any disagreements among management and the independent auditors or the internal auditing department in connection with the preparation of the audited financial statements or the quarterly financial statements.

•      Overseeing the relationship with the independent auditors, including discussing with the auditors the nature and rigor of the audit process, receiving and reviewing audit reports, and providing the auditors with full access to the Committee (and the Board) to report on any and all appropriate matters.

•      Regularly consulting with the independent auditors out of the presence of management about internal controls, the completeness and accuracy of the Company's financial statements and other appropriate matters.

•      Considering any significant changes to the Company's accounting principles and practices as recommended by the independent auditors, management or the internal auditing department and reviewing any required disclosure to the Company's financial statements of significant changes in accounting principles and practices.

•      Reviewing and discussing with management, prior to release, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP financial information, as well as financial information and earnings guidance provided to analysts and rating agencies.

•      Reviewing and discussing with management any audit opinion provided by the independent auditors.

•      Discussing with a representative of management and the independent auditors:  (1) the interim financial information contained in

the Company's Quarterly Report on Form 10-Q prior to its filing, (2) the earnings announcement prior to its release (if practicable), and (3) the results of the review of such information by the independent auditors.  (These discussions may be held with the Committee as a whole or with the Chair in person or by telephone.)

•      Overseeing internal audit activities, including discussing with management and the internal auditors the internal audit function's organization, objectivity, responsibilities, plans, results, budget and staffing.

•      Discussing and reviewing with management, the internal auditors and the independent auditors, in connection with each annual or quarterly report filed with the SEC, the quality and adequacy of and compliance with the Company's internal controls.  This should include a discussion of any significant deficiencies in the design or operation of internal controls and any fraud, whether or not material, that includes management or other employees who have a significant role in the Company's internal controls.  On an annual basis, the Committee shall obtain a written report from management that describes management's own assessment of the effectiveness of such internal controls.

•      Following completion of the annual audit, reviewing separately with each of management, the independent auditors and the internal auditing department any significant difficulties encountered during the course of the audit raised by the independent auditors, management or the internal auditing department, including any restrictions on the scope of work or access to required information.

•      Reviewing with the independent auditors and management the extent to which changes or improvements in financial or accounting practices suggested by the auditors, as approved by the Committee, have been implemented.  (This review should be conducted at an appropriate time subsequent to implementation of changes or improvements, as decided by the Committee.)

•      Discussing with management and/or the Company's legal counsel any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements, and any material reports or inquiries from regulatory or governmental agencies.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
12

• Reviewing all reports concerning any fraud or significant regulatory noncompliance that occur at the Company. This review should include at a minimum consideration of the internal controls that should be strengthened to reduce the risk of a similar event in the future and the impact on previously issued financial statements and reports filed with governmental authorities.

• Meeting separately with each of management and the independent auditors regarding any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

• Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, as well as for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters (subject to the exemptions provided in Rule 10A-3(c) under the Exchange Act). The Committee establishes such procedures pursuant to the "Employee Complaint Procedures for Accounting and Auditing Matters."

• Discussing with management and the independent and internal auditors the Company's major financial risk exposure and the steps management and the independent and internal auditors have taken to monitor and control such exposure, including the Company's risk assessment and risk management policies.

• Adopting written procedures for the confidential receipt, retention and consideration of any report of evidence of a "material violation," as that term is defined by 17 C.F.R. 205.2(i), pursuant to the standards of professional conduct for attorneys appearing and practicing before the SEC in the representation of an issuer under 17 C.F.R. 205.3. The Committee shall also have the authority and responsibility to undertake all of the duties of a "qualified legal compliance committee," as that term is defined by 17 C.F.R. 205.2(k), including informing the Company's chief legal officer and CEO of any report of evidence of a "material violation," determining whether an investigation is necessary and, at the conclusion of any investigation, recommending an appropriate response and informing the chief legal officer, the CEO and the Board of results of any investigation and the appropriate remedial measures to be adopted. The Committee shall also have the authority

and responsibility, acting by majority vote, to take all other associated appropriate action.

## SUBSTANTIVE ALLEGATIONS

### THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO FILE THE FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

36.    On November 7, 2013, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces Second Quarter Fiscal Year 2014 Operating Results" wherein, the Company, in relevant part, stated:

**Strong Cash Flow With $8 Million Generated From Operating Activities**

CHATSWORTH, Calif., Nov. 7, 2013 (GLOBE  NEWSWIRE)-- **Capstone Turbine Corporation** (Nasdaq:CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the second quarter of fiscal year 2014 ended September 30, 2013.

**Second Quarter 2014 Highlights**

•    Total revenue of $35.3 million, up 17% year-over-year

•    Product revenue of $28.7 million, up 22% year-over-year

•    Gross margin of $4.9 million, up 88% year-over-year

•    Gross margin as a percentage of revenue 14%, compared to 9% in second quarter Fiscal 2013

•    Fourth consecutive quarter of double-digit gross margin

•    Cash from operating activities of $8.0 million

**Management Commentary**

"During the second quarter, we delivered a healthy gross margin increase year-over-year while successfully focusing on cash conversion," said Darren Jamison, Capstone's President and Chief Executive Officer.  "Our shipments and collections are back on track and we are expecting a return to sequential margin growth in the second

half of Fiscal 2014 as revenue accelerate in our typically strongest quarters and traction for our C1000 series continues to build.  After generating cash from operations of $8 million for the second quarter, we hope to achieve a targeted cash balance of $30 million by the end of the fiscal year."

**Second Quarter 2014 Financial Summary**

Revenue for the second quarter of Fiscal 2014 was $35.3million, compared to $24.4 million for the first quarter of Fiscal 2014, and $30.1 million for the second quarter of Fiscal 2013.  Capstone's backlog as of September 30, 2013 was $149.8 million, compared to $155.8 million at June 30, 2013, and $141.1 million at September 30, 2012.

Gross margin for the second quarter of Fiscal 2014 was $4.9 million, or 14% of revenue, compared to $3.3 million, or 14% of revenue, for the first quarter of Fiscal 2014, and $2.6 million, or 9% of revenue, for the second quarter of Fiscal 2013.

Research and development expenses were $2.0 million for the second quarter of Fiscal 2014, compared to $2.3 million for the first quarter of Fiscal 2014 and $2.4 million for the second quarter of Fiscal 2013.

Selling, general and administrative expenses were $6.6 million for the second quarter of Fiscal 2014, compared to $7.6 million for the first quarter of Fiscal 2014 and $6.4 million for the second quarter of Fiscal 2013.

Capstone's net loss was $3.9 million, or $0.01 loss per share, for the second quarter of Fiscal 2014, compared to a net loss of $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2014, and a net loss of $6.2 million, or $0.02 per share, for the second quarter of Fiscal 2013.  Capstone's loss from operations for the second quarter of Fiscal 2014 was $3.7 million, compared to $6.6 million for the first quarter of Fiscal 2014 and $6.2 million for the second quarter of Fiscal 2013.

**Liquidity and Capital Resources**

At September 30, 2013, cash and cash equivalents totaled $28.3 million, compared to $21.6 million at June 30, 2013 and $45.2 million at September 30, 2012.

During the quarter ended September 30, 2013, cash from operating activities was $8.0 million and capital expenditures totaled $0.3 million. This compares to cash used in operating activities of $2.6 million and $0.4 million in capital expenditures during the quarter ended September 30, 2012.

37.     That same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2013.  The Company's Form 10-Q was signed by Defendant Reich, and reaffirmed the Company's financial results previously announced the same day.

38.     The Company's Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by defendants Jamison and Reich, in which they certified:

1.     I have reviewed this report on Form 10-Q of Capstone Turbine Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this  report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
16

consolidated subsidiary, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

17

39.     On February 10, 2014, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces Third Quarter Fiscal Year 2014 Operating Results" wherein the Company, in relevant part, stated:

**Record Gross Margin of 20% on Record Revenue of $37.0 Million; Record Backlog of $160.4 Million**

CHATSWORTH, Calif., Feb 10, 2014 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the third quarter of fiscal year 2014 ended December 31, 2013.

**Third Quarter 2014 Highlights**

- Record revenue of $37.0 million, up 11% year-over-year

- Record product revenue of $29.9 million, up 14% year-over-year

- Record gross margin of $7.3 million, up 59% year-over-year

- Gross margin as a percentage of revenue of 20%, compared to 14% in third quarter Fiscal 2013

- New product orders of $40.5 million resulting in book-to-bill ratio of 1.4:1

- Cash balance of $31.6 million at December 31, 2013

**Management Commentary**

"During the third Fiscal quarter of 2014 we reached new company highs for quarterly revenue, gross margin and backlog, with strong shipments and solid new order momentum," said Darren Jamison, Capstone's President and Chief Executive Officer.  "These strong results reflect the success that we are having in penetrating our key markets such as oil and gas and critical power supply while simultaneously managing costs.  Our book-to-bill ratio and ending cash balance were excellent, and we are very close to achieving EBITDA breakeven for the first time in company history.  We expect to meet our

year-end goals for cash and EBITDA during the current quarter, closing out another year of exceptional progress for Capstone."

**Third Quarter 2014 Financial Summary**

Revenue for the third quarter of Fiscal 2014 was $37.0 million, compared to $35.3 million for the second quarter of Fiscal 2014, and $33.3 million for the third quarter of Fiscal 2013.  Capstone's backlog as of December 31, 2013 was $160.4 million, compared to $149.8 million at September 30, 2013, and $136.5 million at December 31, 2012.

Gross margin for the third quarter of Fiscal 2014 was $7.3 million, or 20% of revenue, compared to $4.9 million, or 14% of revenue, for the second quarter of Fiscal 2014, and $4.6 million, or 14% of revenue, for the third quarter of Fiscal 2013.

Research and development expenses were $2.3 million for the third quarter of Fiscal 2014, compared to $2.0 million for the second quarter of Fiscal 2014, and $2.2 million for the third quarter of Fiscal 2013.

Selling, general and administrative expenses were $7.0 million for the third quarter of Fiscal 2014, compared to $6.6 million for the second quarter of Fiscal 2014 and $6.8 million for the third quarter of Fiscal 2013.

Capstone's net loss was $2.2 million, or $0.01 loss per share, for the third quarter of Fiscal 2014, compared to a net loss of $3.9 million, or $0.01 loss per share, for the second quarter of Fiscal 2014, and a net loss of $4.5 million, or $0.01 per share, for the third quarter of Fiscal 2013.  Capstone's loss from operations for the third quarter of Fiscal 2014 was $1.9 million, compared to $3.7 million for the second quarter of Fiscal 2014, and $4.4 million for the third quarter of Fiscal 2013.

**Liquidity and Capital Resources**

At December 31, 2013, cash and cash equivalents totaled $31.6 million, compared to $28.3 million at September 30, 2013, and $41.9 million at December 31, 2012.

During the quarter ended December 31, 2013, cash used in operating activities was $3.8 million and capital expenditures totaled $0.2 million.

This compares to cash used in operating activities of $3.9 million and $0.2 million in capital expenditures during the quarter ended December 31, 2012.

40.     On that same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended December 31, 2013.  The Company's Form 10-Q was signed by defendant Reich, and reaffirmed the Company's financial results previously announced the same day.  The Form 10-Q contained certifications pursuant to SOX, signed by defendants Jamison and Reich, substantially similar to the certifications described above in ¶ 38.

41.     On June 12, 2014, Capstone issued a press release entitled, "Capstone Turbine Announces Fourth Quarter and Fiscal Year 2014 Operating Results" wherein the Company, in relevant part, stated:

**Record Revenue of $133.1 Million for Fiscal 2014**

**Record Full Year Gross Margin of 16%**

**Record Backlog of $171.6 Million at End of Fiscal 2014**

CHATSWORTH, Calif., June 12, 2014 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the fourth quarter and fiscal year ended March 31, 2014.

**Fiscal Year 2014 Highlights**

•      Record annual revenue of $133.1 million, up 4% from Fiscal 2013

•      Record product revenue of $108.8 million, up 6% from Fiscal 2013

•      Gross margin of $21.7 million, or 16% of revenue, compared to $14.4 million, or 11% of revenue, for Fiscal 2013

•      Operating loss decreased 30% year-over-year

- New product orders of $131.5 million resulting in book-to-bill ratio of 1.2:1

- Cash balance of $27.9 million at March 31, 2014

**Fourth Quarter 2014 Highlights**

- Fourth quarter revenue of $36.4 million, up 3% year-over-year

- Quarterly revenue has exceeded prior year 26 of last 27 quarters

- Record quarterly product revenue of $30.0 million, up 3% year-over-year

- Fourth quarter gross margin of $6.1 million, up 24% year-over-year

- Gross margin as a percentage of revenue of 17%, compared to 14% in the fourth quarter Fiscal 2013

- New product orders of $41.2 million resulting in book-to-bill ratio of 1.4:1

- Record product backlog of $171.6 million at March 31, 2014, up 15% year-over-year

- Record Factory Protection Plan backlog of $47.2 million at March 31, 2014, up 35% year-over-year

President and Chief Executive Officer Darren Jamison commented, "Capstone achieved another banner year for business development and margin expansion in Fiscal 2014, ending the year with record quarterly product revenue and the second highest quarter for total revenue in company history. We also set new annual records for revenue and gross margin while entering Fiscal 2015 with solid backlog of $171.6 million, also a company record. The comprehensive operational improvements we have made in recent years have enabled us to make consistent progress along our margin improvement path and reach stronger levels of maturity with respect to product development and channel marketing. Overall, we continue to make significant expansion in existing markets and inroads into promising new markets, and our Fiscal 2014 results position us well for continuing success in Fiscal 2015."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
21

**Fourth Quarter 2014 Financial Summary**

Revenue for the fourth quarter of Fiscal 2014 was $36.4 million, compared to $37.0 million for the third quarter of Fiscal 2014, and $35.4 million for the fourth quarter of Fiscal 2013.

Capstone's backlog as of March 31, 2014 was $171.6 million, compared to $160.4 million at December 31, 2013, and $148.9 million at March 31, 2013.

Gross margin for the fourth quarter of Fiscal 2014 was $6.1 million, or 17% of revenue, compared to $7.3 million, or 20% of revenue, for the third quarter of Fiscal 2014, and $5.0 million, or 14% of revenue, for the fourth quarter of Fiscal 2013.

Research and development expenses were $2.5 million for the fourth quarter of Fiscal 2014, compared to $2.3 million for the third quarter of Fiscal 2014, and $2.2 million for the fourth quarter of Fiscal 2013. Selling, general and administrative expenses were $6.8 million for the fourth quarter of Fiscal 2014, compared to $7.0 million for the third quarter of Fiscal 2014 and $6.7 million for the fourth quarter of Fiscal 2013.

Capstone's net loss was $3.4 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2014, compared to a net loss of $2.2 million, or $0.01 loss per share, for the third quarter of Fiscal 2014, and a net loss of $4.1 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2013. Capstone's loss from operations for the fourth quarter of Fiscal 2014 was $3.1 million, compared to $1.9 million for the third quarter of Fiscal 2014, and $3.9 million for the fourth quarter of Fiscal 2013.

**Fiscal Year 2014 Financial Summary**

Revenue for Fiscal 2014 was $133.1 million, an increase of 4% from $127.6 million for the prior fiscal year.

Fiscal 2014 gross margin was $21.7 million, or 16% of revenue, compared to Fiscal 2013 gross margin of $14.4 million, or 11% of revenue. The year-over-year increase in gross margin of $7.3 million was the result of overall higher sales volume of microturbine products, lower direct material costs, and decreases in royalty expense, warranty

expense, and production and service center labor and overhead expense compared to the prior year.

Research and development expenses were $9.0 million each for Fiscal 2014 and Fiscal 2013.  During Fiscal 2014 supplies expense decreased but was offset by a decrease in cost sharing benefits.

Selling, general and administrative expenses were $28.0 million for Fiscal 2014, compared to $27.4 million for Fiscal 2013.   The net increase in SG&A expenses was comprised of increases in salaries, facilities, consulting and supplies expenses, partially offset by a decrease in marketing expense.

Capstone's net loss decreased 28% to $16.3 million, or a $0.05 loss per share, for Fiscal 2014, compared to a net loss of $22.6 million, or a $0.07 loss per share, for Fiscal 2013.  Capstone's loss from operations for Fiscal 2014 was $15.3 million, a 30% reduction from the Fiscal 2013 loss from operations of $22.0 million.

**Liquidity and Capital Resources**

At March 31, 2014, cash and cash equivalents totaled $27.9 million, compared to $31.6 million at December 31, 2013, and $38.8 million at March 31, 2013.

During the quarter ended March 31, 2014, cash used in operating activities was $3.8 million and capital expenditures totaled $0.4 million. This compares to cash used in operating activities of $3.6 million and $0.3 million in capital expenditures during the quarter ended March 31, 2013.

During the year ended March 31, 2014, Capstone used $15.4 million of cash in operating activities and spent $1.2 million in capital expenditures.  This compares to cash used in operating activities of $17.1 million and $1.2 million in capital expenditures during the year ended March 31, 2013.

42.     That same day, Capstone filed its Annual Report with the SEC on Form 10-K for the fiscal year ended March 31, 2014.  The Company's Form 10-K was signed by defendant Reich, and reaffirmed the Company's financial results previously announced the same day.   The Form 10-K contained certifications

pursuant to SOX, signed by defendants Jamison and Reich, substantially similar to the certifications described above in ¶ 38.

43.     On August 7, 2014, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces First Quarter Fiscal Year 2015 Operating Results" wherein, the Company, in relevant part, stated:

**Record Product Backlog of $175.2 Million at June 30, 2014**

CHATSWORTH, Calif., Aug. 7, 2014 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the first quarter of fiscal year 2015 ended June 30, 2014.

**First Quarter 2015 Highlights**

•       Revenue of $23.3 million, product revenue of $17.6 million

•       Gross margin of $3.4 million, or 15% of revenue

•       Product backlog of $175.2 million at June 30, 2014

•       Cash balance of $46.7 million at June 30, 2014

President and Chief Executive Officer Darren Jamison commented, "Lower than expected revenue and excess finished goods for the first quarter were due to delayed shipment requests for the delivery and installation of equipment on project sites.  The timing fluctuations were not the result of any pattern of project cancellations or postponements by customers, but instead reflect the inconsistent nature of our business on a quarter-to-quarter basis.  Gross margin showed a modest increase year-over-year despite the softer revenue level, which demonstrates the operating and direct material cost improvements that we have made to our manufacturing processes.  Our pipeline remains stronger than ever as a result of the long-term secular trends driving the markets for distributed power generation.  With another record high for backlog set at the end of the first quarter, we expect to be able to make up the first quarter shortfall in revenue throughout the remainder of Fiscal 2015 as we drive our business toward profitability."

**First Quarter 2015 Financial Summary**

Revenue for the first quarter of Fiscal 2015 was $23.3 million, compared to $36.4 million for the fourth quarter of Fiscal 2014, and $24.4 million for the first quarter of Fiscal 2014.

Capstone's backlog as of June 30, 2014 was $175.2 million, compared to $171.6 million at March 31, 2014, and $155.8 million at June 30, 2013.

Gross margin for the first quarter of Fiscal 2014 was $3.4 million, or 15% of revenue, compared to $6.1 million, or 17% of revenue, for the fourth quarter of Fiscal 2014, and $3.3 million, or 14% of revenue, for the first quarter of Fiscal 2014.

Research and development expenses were $2.3 million for the first quarter of Fiscal 2015, compared to $2.5 million for the fourth quarter of Fiscal 2014, and $2.3 million for the first quarter of Fiscal 2014.

Selling, general and administrative expenses were $7.8 million for the first quarter of Fiscal 2015, compared to $6.8 million for the fourth quarter of Fiscal 2014 and $7.6 million for the first quarter of Fiscal 2014.

Capstone's net loss was $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2015, compared to a net loss of $3.4 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2014, and a net loss of $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2014.

Capstone's loss from operations for the first quarter of Fiscal 2015 was $6.7 million, compared to $3.1 million for the fourth quarter of Fiscal 2014, and $6.6 million for the first quarter of Fiscal 2014.

**Liquidity and Capital Resources**

At June 30, 2014, cash and cash equivalents totaled $46.7 million, compared to $27.9 million at March 31, 2014, and $21.6 million at June 30, 2013.

During the quarter ended June 30, 2014, cash used in operating activities was $9.1 million and capital expenditures totaled $0.2 million.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

25

This compares to cash used in operating activities of $15.9 million and $0.3 million in capital expenditures during the quarter ended June 30, 2013.

On May 6, 2014, Capstone closed a public offering of 18,825,000 shares of its common stock at a price of $1.70 per share. Net proceeds from the sale of the shares, after deducting fees and other offering expenses, were approximately $29.8 million.

On June 9, 2014, Capstone amended its credit facility with Wells Fargo Bank to increase the maximum borrowing capacity by $5 million to $20 million, amend the financial covenants, and extend the maturity date of one of the lines of credit to September 30, 2017. Additionally, this amendment made certain changes to decrease the required minimum cash balance relative to the outstanding line of credit advances and set the financial covenants for Fiscal 2015. The amendment also added a $0.5 million non-revolving capital expenditure line of credit.

44.     That same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2014. The Company's Form 10-Q was signed by defendant Reich, and reaffirmed the Company's financial results previously announced the same day. The Form 10-Q contained certifications pursuant to SOX, signed by defendants Jamison and Reich, substantially similar to the certifications described above in ¶ 38.

45.     On November 6, 2014, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces Second Quarter Fiscal Year 2015 Operating Results" wherein the Company, in relevant part, stated:

**Gross Margin Increased 240 Basis Points Year-Over-Year Despite Softer Revenue**

CHATSWORTH, Calif., Nov. 6, 2014 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the second quarter of fiscal year 2015 ended September 30, 2014.

**Second Quarter 2015 Highlights**

- Revenue of $32.2 million, product revenue of $26.7 million

- Gross margin of $5.2 million, or 16% of revenue

- Product backlog of $172.3 million at September 30, 2014

- Cash balance of $40.8 million at September 30, 2014

President and Chief Executive Officer Darren Jamison commented, "The second quarter of Fiscal 2015 was a vast improvement over the first quarter in terms of the timing of shipments and overall sales volume and revenue. Gross margin increased 240 basis points year-over-year despite softer revenue, a direct result of the substantial operational improvements we are continuing to make to reduce our manufacturing costs. Backlog remains high, which is a key leading indicator of future revenue. Based on our order flow and pipeline, we believe that we will return to year-over-year revenue growth and advance toward profitability in the second half of Fiscal 2015, typically our strongest quarters of the year."

**Second Quarter 2015 Financial Summary**

Revenue for the second quarter of Fiscal 2015 was $32.2 million, compared to $23.3 million for the first quarter of Fiscal 2015, and $35.3 million for the second quarter of Fiscal 2014.

Capstone's backlog as of September 30, 2014 was $172.3 million, compared to $175.2 million at June 30, 2014, and $149.8 million at September 30, 2013.

Gross margin for the second quarter of Fiscal 2015 was $5.2 million, or 16% of revenue, compared to $3.4 million, or 15% of revenue, for the first quarter of Fiscal 2015, and $4.9 million, or 14% of revenue, for the second quarter of Fiscal 2014.

Research and development expenses were $2.1 million for the second quarter of Fiscal 2015, compared to $2.3 million for the first quarter of Fiscal 2015, and $2.0 million for the second quarter of Fiscal 2014. Selling, general and administrative (SG&A) expenses were $9.5 million for the second quarter of Fiscal 2015, compared to $7.8 million for the

first quarter of Fiscal 2015 and $6.6 million for the second quarter of Fiscal 2014.   The net increase in SG&A expenses was comprised primarily of $2.9 million in bad debt reserve representing an accounts receivable allowance for a single customer during the three months ended September 30, 2014.  SG&A expenses net of the bad debt reserve for a single customer were $6.6 million for the second quarter of Fiscal 2015, compared to SG&A expenses of $7.8 million for the first quarter of Fiscal 2015 and $6.6 million for the second quarter of Fiscal 2014.

Capstone's net loss was $6.5 million, or $0.02 loss per share, for the second quarter of Fiscal 2015, compared to a net loss of $6.8 million, or $0.02 loss per share, for the first quarter of Fiscal 2015, and a net loss of $3.9 million, or $0.01 loss per share, for the second quarter of Fiscal 2014.  Capstone's loss from operations for the second quarter of Fiscal 2015 was $6.4 million, compared to $6.7 million for the first quarter of Fiscal 2015, and $3.7 million for the second quarter of Fiscal 2014. Capstone's loss from operations net of the bad debt reserve for a single customer was $3.4 million for the second quarter of Fiscal 2015, compared to the loss from operations of $6.7 million for the first quarter of Fiscal 2015, and $3.7 million for the second quarter of Fiscal 2014.

**Liquidity and Capital Resources**

At September 30, 2014, cash and cash equivalents totaled $40.8 million, compared to $46.7 million at June 30, 2014, and $28.3 million at September 30, 2013.

During the quarter ended September 30, 2014, cash used in operating activities was $5.6 million and capital expenditures totaled $0.7 million. This compares to cash generated from operating activities of $8.0 million and $0.3 million in capital expenditures during the quarter ended September 30, 2013.

46.    That same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2014.  The Company's Form 10-Q was signed by defendant Reich, and reaffirmed the Company's financial results previously announced on the same day.   The Form 10-Q contained certifications pursuant to SOX, signed by defendants Jamison and Reich, substantially similar to the certifications described above in ¶ 38.

47. On February 5, 2015, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces Third Quarter Fiscal Year 2015 Operating Results" wherein the Company, in relevant part, stated:

### Record Quarterly Gross Margin Percentage - 20.3%

CHATSWORTH, Calif., Feb. 5, 2015 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the third quarter of fiscal year 2015 ended December 31, 2014.

**Third Quarter 2015 Highlights**

• Revenue of $30.1 million, product revenue of $22.5 million

• Gross margin of $6.1 million, or 20.3% of revenue

• Record product backlog of $175.5 million and record Factory Protection Plan (FPP) backlog of $61.0 million as of December 31, 2014

• Cash balance increased to $40.9 million as of December 31, 2014

President and Chief Executive Officer Darren Jamison commented, "We delivered the highest quarterly gross margin percentage in the history of Capstone during the third quarter, despite a 19% decline in revenue year- over-year driven by continuing global macroeconomic headwinds and the strong U.S. dollar. This is a performance milestone that underscores the operational transformation and cost structure improvements that we have implemented over the past several years. In addition, the advancements in our aftermarket services business have led to lower warranty expense and a decrease in reliability repair as the C200 and C1000 Series product continues to mature. We now have a record level of Factory Protection Plan (FPP) backlog, representing 26% of our record total product and FPP backlog at December 31, 2014, and the margins on our FPP contracts continue to improve. Our distribution channels get stronger every quarter, our cash balance remains very healthy, and we are experiencing pockets of strength in key geographic and vertical markets. Even as global macroeconomic

forces continue to impact our business, these company-specific trends bode well for our performance going forward."

**Third Quarter 2015 Financial Summary**

Revenue for the third quarter of Fiscal 2015 was $30.1 million, compared to $32.2 million for the second quarter of Fiscal 2015, and $37.0 million for the third quarter of Fiscal 2014.

Capstone's product backlog as of December 31, 2014 was $175.5 million, compared to $172.3 million at September 30, 2014, and $160.4 million at December 31, 2013.

Gross margin for the third quarter of Fiscal 2015 was $6.1 million, or 20.3% of revenue, compared to $5.2 million, or 16.3% of revenue, for the second quarter of Fiscal 2015, and $7.3 million, or 19.8% of revenue, for the third quarter of Fiscal 2014.

Research and development expenses were $2.4 million for the third quarter of Fiscal 2015, compared to $2.1 million for the second quarter of Fiscal 2015, and $2.3 million for the third quarter of Fiscal 2014.

Selling, general and administrative expenses were $7.5 million for the third quarter of Fiscal 2015, compared to $9.5 million for the second quarter of Fiscal 2015 and $7.0 million for the third quarter of Fiscal 2014.

Capstone's net loss was $3.9 million, or $0.01 loss per share, for the third quarter of Fiscal 2015, compared to a net loss of $6.5 million, or $0.02 loss per share, for the second quarter of Fiscal 2015, and a net loss of $2.2 million, or $0.01 loss per share, for the third quarter of Fiscal 2014.  Capstone's loss from operations for the third quarter of Fiscal 2015 was $3.8 million, compared to $6.4 million for the second quarter of Fiscal 2015, and $1.9 million for the third quarter of Fiscal 2014.

**Liquidity and Capital Resources**

At December 31, 2014, cash and cash equivalents totaled $40.9 million, compared to $40.8 million at September 30, 2014, and $31.6 million at December 31, 2013.

During the quarter ended December 31, 2014, cash used in operating activities was $1.8 million and capital expenditures totaled $0.2 million. This compares to cash used in operating activities of $3.8 million and $0.2 million in capital expenditures during the quarter ended December 31, 2013.

48.    On the same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended December 31, 2014.  The Company's Form 10-Q was signed by defendant Reich, and reaffirmed the Company's financial results previously announced on the same day.   The Form 10-Q contained certification pursuant to SOX, signed by defendants Jamison and Reich, substantially similar to the certifications described above in ¶ 38.

49.    On June 15, 2015, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Announces Fourth Quarter and Fiscal Year 2015 Operating Results."  Therein, the Company, in relevant part, stated:

CHATSWORTH, Calif., June 15, 2015 (GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST), the world's leading clean technology manufacturer of microturbine energy systems, today announced its financial results for the fourth quarter and fiscal year ended March 31, 2015.

**Highlights**

- Gross margin of $18.3 million, or 16% of revenue, for Fiscal 2015

- Gross margin as a percentage of revenue flat compared to Fiscal 2014 despite a 13% decline in revenue, reflecting operational improvements to the cost structure

- Accessories, parts and service revenue up 7%

- Factory Protection Plan (FPP) backlog of $61.2 million as of March 31, 2015

- Cash balance of $32.2 million as of March 31, 2015

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
31

President and Chief Executive Officer Darren Jamison commented, "In Fiscal 2015, Capstone adapted to challenging global and economic market dynamics in ways that have made us a more resilient company today and for the future.  We continued to make significant progress in strengthening our company by further diversifying our business, growing and maturing our distribution network, improving our product reliability, expanding into promising new geographies, and implementing cost savings.  However, our progress was eclipsed by headwinds from the dramatic downturn of the oil markets, a substantially stronger U.S. dollar making our products more expensive overseas, and on-going geopolitical tensions in Russia, North Africa and the Middle East.  These conditions impacted our business in Fiscal 2015, but they also prompted us to closely evaluate areas of our business that are within our control.  As a result, we have taken decisive actions that ultimately have made Capstone stronger, leaner, more flexible and better positioned for growth than ever before.  We look forward to regaining our growth momentum over the next year ahead."

**Fourth Quarter 2015 Financial Summary**

Revenue for the fourth quarter of Fiscal 2015 was $29.9 million, compared to $30.1 million for the third quarter of Fiscal 2015, and $36.4 million for the fourth quarter of Fiscal 2014.

Capstone's product backlog as of March 31, 2015 was $165.7 million, compared to $175.5 million at December 31, 2014, and $171.6 million at March 31, 2014.

Gross margin for the fourth quarter of Fiscal 2015 was $3.5 million, or 11.8% of revenue, compared to $6.1 million, or 20.3% of revenue, for the third quarter of Fiscal 2015, and $6.1 million, or 16.9% of revenue, for the fourth quarter of Fiscal 2014.  Gross margin for the fourth quarter of Fiscal 2015 was impacted by a $1.2 million non-cash charge for slow-moving inventory related to the Company's waste heat recovery generator product.  In addition, cost of goods sold for the quarter included $0.7 million of product shipped without recognizing the associated revenue.  Without these two items, gross margin for the fourth quarter of 2015 would have been $5.4 million, or 18.0% of revenue.

Research and development expenses were $2.9 million for the fourth quarter of Fiscal 2015, compared to $2.4 million for the third quarter of Fiscal 2015, and $2.5 million for the fourth quarter of Fiscal 2014.

Selling, general and administrative expenses were $14.7 million for the fourth quarter of Fiscal 2015, compared to $7.5 million for the third quarter of Fiscal 2015 and $6.8 million for the fourth quarter of Fiscal 2014.  The Company recorded a bad debt expense of approximately$7.1 million during the fourth quarter of Fiscal 2015 against receivables owed to us by one of our Russian distributors that has been impacted by the steep decline of the Russian ruble.  In comparison, the Company had no such expense of this magnitude during the third quarter of 2015 or fourth quarter of 2014.

Capstone's net loss was $14.3 million, or $0.05 loss per share, for the fourth quarter of Fiscal 2015, compared to a net loss of $3.9 million, or $0.01 loss per share, for the third quarter of Fiscal 2015, and a net loss of $3.4 million, or $0.01 loss per share, for the fourth quarter of Fiscal 2014. Capstone's loss from operations for the fourth quarter of Fiscal 2015 was $14.1 million, compared to $3.8 million for the third quarter of Fiscal 2015, and $3.1 million for the fourth quarter of Fiscal 2014.

**Fiscal Year 2015 Financial Summary**

Revenue for Fiscal 2015 was $115.5 million, compared to $133.1 million for Fiscal 2014.

Fiscal 2015 gross margin was $18.3 million, or 16% of revenue, compared to Fiscal 2014 gross margin of $21.7 million, or 16% of revenue. While annual revenue decreased 13%, gross margin percentage was flat compared to Fiscal 2014.  The change in gross margin dollars was driven by multiple factors, including lower royalty expense of $1.2 million, lower production and service center labor and overhead expense of $1.0 million and lower warranty expense of $0.4 million.  The positive impact of these factors was offset by the adverse impact of lower volume, lower average selling prices and a change in product mix of $5.0 million, and higher inventory charges of $1.0 million.

Research and development expenses were $9.7 million for Fiscal 2015, compared to $9.0 million for Fiscal 2014.  Benefits from cost-sharing

programs decreased by approximately $0.9 million to $0.5 million in Fiscal 2015 from $1.4 million in Fiscal 2014.  In addition, professional services expense decreased by $0.2 million in Fiscal 2015 as compared to the previous year.

Selling, general and administrative expenses were $39.5 million for Fiscal 2015, compared to $28.0 million for Fiscal 2014.   The net increase in SG&A expenses was comprised of a $9.9 million increase in bad debt reserve (of which $7.1 million was recorded in the fourth quarter of Fiscal 2015 as referenced above) along with increases in salaries, professional services, marketing and business travel expense, partially offset by a decrease in facilities and supplies expense.

Net loss was $31.5 million, or a $0.10 loss per share, for Fiscal 2015, compared to a net loss of $16.3 million, or a $0.05 loss per share, for Fiscal 2014.  Capstone's loss from operations was $30.9 million for Fiscal 2015, compared to a loss from operations of $15.3 million for Fiscal 2014.

**Liquidity and Capital Resources**

At March 31, 2015, cash and cash equivalents totaled $32.2 million, compared to $40.9 million at December 31, 2014, and $27.9 million at March 31, 2014.

During the quarter ended March 31, 2015, cash used in operating activities was $6.6 million and capital expenditures totaled $0.4 million. This compares to cash used in operating activities of $3.8 million and $0.4 million in capital expenditures during the quarter ended March 31, 2014.

During Fiscal 2015, Capstone used $23.0 million of cash in operating activities and spent $1.6 million in capital expenditures.  This compares to cash used in operating activities of $15.4 million and $1.2 million in capital expenditures during Fiscal 2014.

**Subsequent Event**

As previously announced, in April 2015, the Company took actions to flatten the organization and streamline internal operations to better foster innovation and creativity, focus on product improvements, and broaden aftermarket services.   These actions are expected to lower

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

34

operating costs and result in an estimated $2 million in annual savings after payment of associated employee severance benefits.

50.     On the same day, Capstone filed its Annual Report with the SEC on Form 10-K for the fiscal year ended March 31, 2015.  The Company's Form 10-K was signed by defendant Brooks, and reaffirmed the Company's financial results previously announced on the same day.  The Form 10-K contained certifications pursuant to SOX, signed by defendants Jamison and Brooks, substantially similar to the certifications described above in ¶ 38.

51.     On August 6, 2015, the Individual Defendants caused Capstone to issue a press release entitled, "Capstone Turbine Q1 Total Revenue Increases 16% Year-Over-Year and Gross Profit Margin Increases 200 Basis Points." Therein, the Company, in relevant part, stated:

> CHATSWORTH, Calif., Aug. 6, 2015(GLOBE NEWSWIRE) -- **Capstone Turbine Corporation** (Nasdaq: CPST) (www.capstoneturbine.com), the world's leading clean technology manufacturer of microturbine energy systems, reports financial results and business highlights for its first quarter of fiscal 2016, ended June 30, 2015.
>
> Total revenue for the first quarter of fiscal 2016 was $27.0 million, compared with $23.3 million for the same quarter a year ago, which is an increase of 16%.
>
> "We are off to a great start for the fiscal year, with revenue rebounding as we recorded our second-best level of Q1 revenue in our company's 20-year history," said Darren Jamison, President and Chief Executive Officer.   "We continued to experience strong revenue from our aftermarket service business and benefitted from strength in our combined heat and power (CHP) business as the energy efficiency market remained robust.  We also had improvements in our oil and gas business.  Our geographical diversification is also paying off, as we are making good progress in developing our markets in Mexico, South America, Africa and the Middle East.  These efforts come as we strive to build upon our business in areas with greater opportunities while minimizing our current exposure in Russia.  This quarter's revenue did

not include any product shipments to BPC Engineering, our Russian distributor, as compared to 13% of our revenue for the same period a year ago, demonstrating the success of our diversification strategy."

Mr. Jamison continued, "While the macroeconomic headwinds continued to be a factor this quarter, the steps we took to offset them are proving to be effective.  We believe that our recently announced commitment by our global distributors to add 100 salespeople by the end of this calendar year and our increased marketing campaign will strengthen our efforts to capture additional market opportunities.  We continue to focus on improving our products, building brand awareness and new channels to market as we build upon our diversified network of strategic distribution partners.  All of this, combined with the actions we have taken to improve operating costs including the new management restructure and implement operating efficiencies, puts us in a strong position for what we believe will be a very important year for our company."

**Highlights of the Quarter:**

•      First quarter revenue increased 16% to $27.0 million over the prior year's quarter.  Product revenue increased 15% to $20.2 million and accessories, parts and service revenue increased 19% to $6.8 million over last year.

•      Net loss decreased to $6.0 million compared with $6.8 million in the first quarter a year ago, despite a $0.6 million one-time charge to operating expenses for severance and other termination benefits in the first quarter of fiscal 2016.

•      The CHP market remained strong and the oil and gas market improved.

•      Gross profit margin increased more than 200 basis points to 17% from 15% in the same period a year ago.

•      Revenue benefitted from strong contributions from the North American, Asian and South American markets this quarter.

•      Capstone received several significant orders this quarter, including:

• A groundbreaking C600 order in the Midwest for a new Open Access Technology International (OATI) data center and office facility. An order for 25 C65 microturbines from an existing oil and gas customer that intends to use them for numerous facets of the shale oil and gas production process.

• Two orders for C1000 microturbines for energy efficiency projects in New York City—one at a New York University research and learning facility and a second at the River Park Towers residential complex in the Bronx.

• Received an order for a C1000 microturbine for a power generation facility owned by Kineticor Resource Corporation, a Canadian energy services company, for flare gas utilization.

• Sold a C1000 to update an established solid waste treatment plant in Finland.

**Financial Highlights for the Fiscal First Quarter 2016**

Revenue for the first quarter of fiscal 2016 increased $3.7 million, or 16%, to $27.0 million from $23.3 million for the first quarter of fiscal 2015.

Total backlog as of June 30, 2015 was $160.5 million compared with $175.2 million as of June 30, 2014, and $165.7 million as of March 31, 2015.

Gross profit margin improved more than 200 basis points to 17% for the first quarter of fiscal 2016, compared with 15% for the first quarter of fiscal 2015, and was $4.7 million for the first quarter of 2016 compared with $3.4 million for the first quarter a year ago. The increase in the gross margin during the first quarter of fiscal 2016 compared to the first quarter of fiscal 2015 was primarily the result of a shift in product mix of $1.1 million, as the company sold a higher number of its C1000 Series systems and includes revenue that was recognized without associated direct material costs from prior periods, lower warranty expense of $0.2 million and lower production and service center overhead expenses of $0.1 million. The positive impact of these factors was partially offset by the adverse impact of an increase in royalty expense of $0.1 million.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
37

Research & Development expenses for the first quarter of fiscal 2016 were $2.4 million, compared with $2.3 million for the first quarter of fiscal 2015.

Selling, General & Administrative expenses for the first quarter of fiscal 2016 were $8.1 million, which includes $0.5 million of severance and other one-time termination benefit charges, compared with $7.8 million for the first quarter of fiscal 2015.

Net loss for the quarter decreased 12% to $6.0 million, compared with $6.8 million for the first quarter a year ago.  Net loss per share was $0.02, unchanged from the prior year's first quarter.  Operating loss for the first quarter of fiscal 2016 was $5.8 million compared with a loss from operations of $6.8 million for the first quarter a year ago.

**Liquidity and Capital Resources**

At June 30, 2015, cash and cash equivalents were $22.4 million ($27.4 million when combined with restricted cash related to the Credit facility), compared to $32.2 million as of March 31, 2015.

During the quarter ended June 30, 2015, cash used in operating activities was $6.9 million and capital expenditures totaled $0.9 million. This compares with cash used in operating activities of $9.1 million and capital expenditures of $0.2 million in the first quarter a year ago.

52.    On the same day, Capstone filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2015.  The Company's Form 10-Q was signed by defendant Brooks, and reaffirmed the Company's financial results previously announced on the same day.  The Form 10-Q contained certifications pursuant to SOX, signed by defendants Jamison and Brooks, substantially similar to the certifications described above in ¶ 38.

53.    The statements contained in ¶¶ 36-52 were false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants knew or recklessly disregarded, but failed to disclose that, among other things:  (1) BPC, one of the Company's main Russian distributors, was unlikely to be able to fulfill many

of its legal and financial obligations to Capstone; (2) Capstone failed to make appropriate adjustments to its accounts receivable and backlog to account for BPC's inability to fulfill its obligations to Capstone; (3) Capstone issued financial statements in violation of GAAP; (4) the Company lacked adequate internal controls over accounting; and (5) as a result of the foregoing, the Company's financial statements, as well as the Individual Defendants' statements about Capstone's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

## THE TRUTH IS REVEALED

54.    On October 1, 2015, Capstone issued a press release disclosing that its preliminary second quarter earnings were "notably below management's expectations and analysts' consensus estimates as continued headwinds in the oil and gas market and a strong U.S. dollar delayed orders and shipments in the quarter."  The Company further disclosed that it "received no significant payments from its Russian distributor, who until recently was one of [its] largest customers."

55.    On November 5, 2015, after the market closed, Capstone disclosed its second quarter, 2015 results.  The Company disclosed a net loss of $7.9 million, or $0.02 per share for the quarter.

56.    Given the importance of BPC to the financial success of the Company, the Individual Defendants knew or recklessly disregarded the financial condition of BPC and the impact BPC's failure to pay on its obligations would have on the Company.

57.    For instance, BPC has been prominently mentioned in each of the past several Form 10-Ks of the Company in connection with its share of both Capstone's revenue and its receivables:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
39

| Fiscal Year | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Percent of Revenue | 11% | 17% | 11% | 26% | 23% |
| Percent of Accounts Receivable | --- | 26% | 35% | 44% | 26% |

58.     Similarly, the Company has admitted in multiple SEC filings over the years that BPC is of such significance to the Company that the loss or change in this relationship would greatly affect Capstone, signifying that the Board had actual or constructive knowledge regarding BPC given its importance.  For instance, in every Form 10-K filed by the Company since 2009, Capstone has admitted that the ***"Loss of a significant customer could have a material adverse effect on our results of operations"*** and in connection therewith, stating, "The loss of E-Finity, Horizon, ***BPC or any other significant customers could adversely affect our results of operations.***"  (emphasis added).

59.     As a result of the above news, the Company lost close to 92% of its market capitalization as of the end of 2015 and its stock currently trades at less than $1.25 a share.

## DAMAGES TO CAPSTONE

60.     As a result of the Individual Defendants' wrongful conduct, Capstone disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated Capstone's credibility.   Capstone has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

61.     Indeed, the Individual Defendants' false and misleading statements as alleged above, have subjected Capstone to two lawsuits for violations of the federal securities laws pending in this Court, captioned *Kinney v. Capstone Turbine Corp. et*

*al.*, 15 Civ. 8914 and *Grooms v. Capstone Turbine Corp. et al.*, 15 Civ. 09155 (collectively, the "Securities Class Actions").

62. As a direct and proximate result of the Individual Defendants' actions, Capstone's market capitalization has been substantially damaged, losing tens of millions of dollars in value as a result of the conduct described herein.

63. Moreover, these actions have irreparably damaged Capstone's corporate image and goodwill. For at least the foreseeable future, Capstone will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Capstone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

64. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65. Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties.

66. Plaintiff is an owner of Capstone common stock and was an owner of Capstone common stock at all times relevant hereto.

67. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

68. As a result of the facts set forth herein, Plaintiff has not made any demand on the Capstone Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

69.     At the time this action was commenced, the Board consisted of eight directors: defendants Jamison, Atkinson, Lotan, Mayo, Simon, Protsch, Van Deursen, and Wilk (the "Director Defendants").  All eight members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THE DIRECTOR DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

70.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

71.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Capstone.

72.     The Director Defendants' making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were

being discharged in good faith and with the required diligence constitute breaches of fiduciary duties have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Capstone to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

## DEFENDANT JAMISON LACKS INDEPENDENCE

73.     Capstone has conceded in its SEC filings that defendant Jamison is not an independent director of the Company.   In its July 15, 2015 annual proxy statement, Capstone states that:  "The Board of Directors has determined that all of the members of the Board of Directors, other than Mr. Jamison, are 'independent directors . . . .'"

74.     In addition to this lack of independence, Jamison is not disinterested for purposes of demand futility because his principal occupation is President and CEO of Capstone.  According to the Company's SEC filings, from 2013 to 2015, Jamison received total compensation of $1,369,408, $995,907, and $751,230, respectively.

75.     Defendant Jamison is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.

## DEFENDANTS ATKINSON, LOTAN, SIMON, AND PROTSCH FACE A SUBSTANTIAL LIKELIHOOD OF LIABLITY

76.     During the Relevant Period, defendants Atkinson, Lotan, Simon, and Protsch served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, oversight of the Company's legal compliance program,

reviewing the Company's annual and quarterly financial reports and press releases, and reviewing the integrity of the Company's internal controls. Defendants Atkinson, Lotan, Simon, and Protsch breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures. Therefore, defendants Atkinson, Lotan, Simon, and Protsch each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS FOR THE FOLLOWING ADDITIONAL REASONS**

77. If Capstone's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Capstone against the Individual Defendants, known as the "insured versus insured exclusion."

78. As a result, if the Director Defendants were to sue themselves or certain of the officers of Capstone, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

79.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Capstone by prosecuting this action.  Therefore, demand on Capstone and its Board is futile and is excused.  Capstone has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

## AGAINST ALL THE INDIVIDUAL DEFENDANTS FOR <u>BREACH OF FIDUCIARY DUTY</u>

80.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

81.     The Individual Defendants each owed Capstone and its stockholders the fiduciary duties of loyalty, good faith, candor and due care in managing and administering the Company's affairs.

82.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Capstone.

83.     The Individual Defendants breached their fiduciary duties owed to Capstone and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Capstone's business, rendering them personally liable to the Company.

84.    Each of the Individual Defendants had actual or constructive knowledge that PBC was unlikely to be able to fulfill many of its legal and financial obligations to Capstone and that Capstone failed to make appropriate adjustments to its accounts receivable and backlog to account for BPC's inability to fulfill its obligations to Capstone.  The Individual Defendants breached their fiduciary duties by knowingly causing and/or recklessly allowing the Company to make false and misleading statements regarding BPC and the Company's financial condition as alleged herein.

85.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties of loyalty, good faith, candor and due care, as alleged herein, Capstone has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Capstone and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

46

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  March 7, 2016

Respectfully submitted,

THE WAGNER FIRM

By:  _s/ Avi Wagner_
Avi Wagner
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 491-7949
Facsimile:  (310) 491-7949
Email:  avi@thewagnerfirm.com

Michael J. Hynes
HYNES KELLER & HERNANDEZ, LLC
1150 First Avenue, Suite 501
King of Prussia, PA 19406
Telephone:  (610) 994-0292
Facsimile:  (914) 752-0341

J. Brandon Walker
Todd Henderson
BRAGAR EAGEL & SQUIRE, P.C.
885 Third Avenue, Suite 3040
New York, New York  10022
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506

## VERIFICATION

I, Isaac Haber, hereby declare, under penalty of perjury, as follows:

    1. My name is Isaac Haber and I am the plaintiff in the above-captioned stockholder derivative action.   I have read the foregoing Verified Stockholder Derivative Complaint (the "Complaint") and authorized its filing.   Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information, and belief.

    2. I am committed to and hereby declare my intent to fairly and adequately represent the interests of Capstone Turbine Corp. and its stockholders in this action.

DATED: March 7, 2016

                                  Isaac Haber

2